Madam Clerk, please call the last case in the morning. 15-1709, Pasha Hunt-Golliday v. Cook County Facilities Counsel, you may proceed. Thank you. May it please the Court, Counsel, my name is John Popelka. I'm here on behalf of the petitioner in this case, Pasha Hunt-Golliday. This case was before the Commission and is now before you. Pursuant to our petitions filed under Sections 8A and 19H, the 19H petition was timely filed. There was no objection on any statutory basis to it. The underlying case involved a shoulder injury to my client who was a journeyman ironworker. That case was tried before arbitrator came. He issued a decision. The respondent then appealed that decision, and that decision then came final on Halloween Day, October 31st of 2011. Within a few weeks of that, we requested authorization for additional medical care. The case had been denied up to that point on all issues, accident, causation, et cetera. We requested authorization. It was granted within a couple of weeks. The client, within 60 days of the decision, was in seeing her treating physician again, Dr. Rowland, on December 20th of 2011. He noted she had persistent pain, took an X-ray. The X-ray revealed a type 3 acromion. I made a mistake in my brief. I had indicated in my argument regarding the material increase. It went from a type 1 to a type 3. That was incorrect. Counsel corrected it in her brief. It went from a type 2 to a type 3, so I want to make that clear. Let me ask you one question here that's hanging here. Sure. When she saw treatment with Rowland, it looked like the treatment consisted primarily of lidocaine or Kenlog injections and physical therapy, which the argument is was essentially the same as the treatment he had recommended in 2006, 2007, other than surgery. So what was different? Well, following the surgery that he did do previously, she went from a type 3 acromion, which obviously necessitated a treatment, to a type 2. He was comfortable with her condition at a type 2 acromion to release her to return back to work and to categorize her as being at MMI at that time. But she was still complaining of pain at that time. She was in persistent pain, which is reflected in the arbitrator's decision. It wasn't clear he released her to full duty because that doesn't appear in the records, but he did indicate she had persistent pain. She saw a county doctor about a month after Dr. Rowland found her to be at MMI, and there were restrictions imposed that the arbitrator felt were consistent with the shoulder. And I would like to point out the TTD was awarded beyond the MMI date. The MMI date was in May of 2007. The TTD was awarded through July of 2007. So the first issue is causation. The commission felt that there was no causation between the current condition of ill-being and the original accident. On that issue, there is one source of evidence, and our prime official case was based upon the evidence of Dr. Rowland. Dr. Rowland issued a report and a statement that was dated November 27 of 2012. He states, and I quote, page 813 of the record, the patient's shoulder problem is related to a prior injury sustained on February 20, 2006. That would seem pretty straightforward. There were also several other references where he noted that it was causally related. And the disability forms, the respondent's disability forms that the doctor filled out for a respondent and sent to them. What was the rebuttal of the prime official case? There was none. There is no Section 12 opinion. There's no contradictory opinion stating that it's not causally related. What's the evidence that there was actually an increase in disability? Okay. Because the commission denied for two reasons. Number one, they said no causal connection. And number two, they said even if there is a condition, there's no increase in the disability. Well, I laid out three different factors that I felt showed it. Let me ask you another question. You filed a 19-H and 8-A petition. Are those two separate issues? And my point is this person had open medical. That's correct. So the commission could have said we find no increase in disability. However, there is a causal connection, and so we're going to allow the medical because this relates back to the original injury. Yes. Those aren't dependent on each other. Correct. And I think the penalty request, too, is not dependent on the 19-H. I don't think the TTD necessarily is based on the poor versus industrial commission case, indicating that all you needed to show was a destabilizing, not necessarily a material increase. What was the destabilization? She was on light duty at the time of the original hearing. The employer would no longer accommodate it, but there isn't any indication that she was in any worse shape at the time of this hearing than she was in at the time of the original hearing. Well, I would argue that that's not the case. There are three factors I would rely on. The first is the most obvious is the change in the X-rays. There was an X-ray taken on December 20th of 2011. The only prior X-ray taken was right after the surgery. The first X-ray taken that I'm referring to post-operatively, December 6th of 2006, showed a type 2 acromion. I've already pointed that out. But there was a second thing that should be noted. There was no narrowing of the AC joint found in that X-ray. The AC joint was normal. When you go forward to the next X-ray that was done on December 20th, 2011, about five years later, there is now a type 3 acromion. We can't say when that occurred during that five-year period. I counsel pointed that out, and that is true. But that's when it becomes apparent and is consistent with complaints. But then there is the additional finding of the narrowing of the AC joint in that X-ray. That is a change from the prior condition. And I would argue it is a material increase in light of the fact that she was symptomatic. She said she was beginning to have trouble sleeping. Her complaints, it occurs to me, at the 19-H hearing are really no different than they were at the original hearing. She claimed that she had trouble with the shoulder, she had pain in the shoulder. And it was clear at the original hearing she was not pain-free. She was symptomatic. I agree with you. But she did not complain about the difficulty sleeping at that point. She also did not complain about the tingling sensation coming from the elbow down into the hand or into the arm and affecting the entire hand and all the fingers that Dr. Wolin noted in the 2011 and 2012 records. So is there any evidence in this record from Dr. Wolin that the condition of her shoulder, subsequent to the original hearing, was in any worse shape? Well, I would argue in addition to the AC narrowing, there was a third factor. And that third factor was in June of 2012 when he ordered the MR arthrogram. The reason he ordered the MR arthrogram was because he suspected rotator pathology at that point. He had never, in his prior records from 2006 and 2007, made any indication that there was any kind of rotator cuff pathology. Well, he didn't make any. He never gave an opinion that she had rotator cuff pathology that was causally connected. But nobody suspected it either. Well, I understand that. But the fact of the matter is the only thing he didn't go on is the opinions he gave. The condition of her shoulder at the time of the 19-H, according to him, was causally related to a work accident. If there's any question about that. But the question that I have is where is his testimony that there was really a change in her disability, a material change in her disability, from the time of the original hearing to the 19-H? He didn't testify, so we don't have that testimony. So we can only assume that because it went from a type 2 to a type 3, that that's an immaterial increase in disability. But how do we know that? Well, that's just part of it. There's the type 2 to type 3. There's the joint space narrowing of the acromioclavicular joint. And there is also now the suspicion of a rotator cuff pathology. There's the tingling going down the entire arm into the hand and all of the fingers. That's a new issue, too, that never appeared anywhere prior to his records in 2011 and 2012. And the issue of difficulty sleeping. So the problem is she didn't have the MRR program. It wasn't authorized. So we don't know what the MRR program is going to find. So he doesn't get to that point where he gets to give that opinion on the rotator cuff pathology. Council points out in a brief, well, this really isn't a very good argument because she could have just put this treatment through a group insurance carrier. But that's not true. Our Exhibits 5 and 6 are the two outstanding medical bills for the treatment she did receive from 2011 and 2012 that are unpaid. The athletical bill, she did get physical therapy, $8,000-plus. Dr. Wolman's bill, just under $2,100. They were paid by group. They were rejected by group because they were work-related. So she could not have put her medical care through a group. During the four-and-a-half-year period between 2007 and 2011, she waited for a final decision. The decision came back in her favor. She immediately sought medical care, which was authorized by the county. You'll note in my brief and in the records that Jason Henschel, the adjuster, called Dr. Earp, had contact with Dr. Wolman's office, and it's noted in Dr. Wolman's records. He authorized the treatment. He allowed her to come in. His testimony was interesting on why he didn't continue paying for the medical care. He did not pay for the medical care because he didn't think it was causally related. His testimony was she had restrictions. They were being accommodated by facilities management. It was their problem. I shouldn't have to be paying her. And much as the facilities management gentlemen say, the director, James D'Amico, he said, I talked to her. I ran into her, and I told her, look, you're an iron worker. You're not a data entry. We don't need another data entry. We need you back at iron work, and we're going to get you back to iron work. So we're going to send you to the county doctor. They did send her to the county doctor. That was March 1st of 2012, just a couple of months, 60 days after she first saw Dr. Wolman. To their surprise, apparently, the county doctor agreed with Dr. Wolman's restrictions, and that's the point where they said, okay, we can't accommodate your restrictions any further. Well, what restrictions could they not accommodate? Well, the shoulder. She was seen for the shoulder on that date by the county doctor. That's what the issue was because Dr. Wolman had now imposed the no repetitive use of the right shoulder restriction. That's a new restriction, too. That is also a sign of a material increase in her condition. Now she can't repetitively use the right shoulder that she previously had been able to, and she had not previously been restricted from. What were her restrictions at the time of the original hearing? She was under restriction because of a bad back, wasn't she? She had a bad back, too. That was superimposed at some point. She had a back surgery. But she was under restrictions at the time of the original hearing, work restrictions. Well, she was. Or being accommodated. Yes, she was. For both the back and for the shoulder. And I base that on, now the commission said she was at full duty, but that's not consistent with the law of the case or the underlying commission award. On page 19 of my brief, I indicate that page 9 of the arbitrator's decision said that the arbitrator found, quote, no, Dr. Wolman's records, quote, do not specifically indicate whether the petitioner was released to full duty work or light duty restrictions, but his records do indicate the petitioner was having ongoing symptoms with the right shoulder. He then goes on to note that after that last visit with Dr. Wolman, she went to the county doctor on June 28th of that year, 2007, and the restrictions were no lifting greater than 25 pounds. That could be a back restriction. No excessive bending, stooping, or twisting, but no operating machinery or vibrating tools. And the arbitrator specifically found, quote, some of these restrictions are consistent with her previous restrictions for her right shoulder when she was released under light duty restrictions on June 19th, 2006. At that time, she was directed not to operate heavy machinery or vibratory tools. So it's not, there do appear that there were restrictions. The commission was wrong that she had a full duty release from Dr. Wolman. He didn't say that. He didn't indicate that. So if their basis for finding no causation and no material increase is this full duty release, if that's part of it, that's not correct. It would probably go to causation, but I'm not sure it goes to material increase because we're still left with the thing, what effect is it to go to two to three? I mean, what does it mean? That's a good question. Let's look at her medical care, what it means for her in particular. Medical care is different because, as Justice Stewart said, there's a difference between her entitlement to medical care because it was open, because it was tried, and her right to an increased disability award. Before she had the surgery in 2006 or 2007, she was found to have a type 3 acromion. At that time, Dr. Wolman determined that that warranted surgical correction. The surgical correction brought her back to a type 2. She's stable then at that point. At a type 2, she's stable, able to work with whatever restrictions she has, is a productive member of society working for the county. It progresses to a type 3 again. And what occurs when it's determined that she's progressed to a type 3? Treatment once again. An injection, which was authorized by the county. Work restriction. No repetitive use of the shoulder. Physical therapy. And then an eventual request that she undergo an MRR program to find out what further is going on. So there is an increase. There is a difference between the two and the three. I don't dispute the fact that she's getting medical treatment at the time that she has this type 3. The commission seemed to be impressed by the fact that she had gone without any treatment at all for four and a half years. Right. Now she's found to have this type 3. And, yes, she gets some physical therapy. It occurs to me that all the things that she's complaining about at the time of the 19-H is exactly what she was complaining about at the time of the original hearing. That is what the commission said. The arbitrator noted at the time of the original hearing that she continued to complain of pain in the anterior aspect of her shoulder. She had tenderness to the touch. She had grinding to the top of her shoulder. She had occasional shrubbing of her shoulder at night and stamping in her neck. So we have a woman who gets an original award, and we know she's not well. I mean, she has this bad shoulder. So my big question with this is not the causation issue, because I think the causation issue goes to the question of whether she's entitled to have her medical bills paid for. That's a different issue than whether her disability has increased. So I go back to the same question. How has her disability increased, and who says so? Because I don't know the difference between a type 2 and a type 3. It has to be inferred. What we do know from a type 2 to a type 3, what we can absolutely say with certainty in this case, type 2 is stable enough to allow her to work. Type 3 required treatment each time. We know that from inferring that from the records. But I would just caution you on the you're saying the complaints weren't different. The complaints aren't what made the material increase or not. I think you have to look at the medical condition, and I think that's what the commission relied on. They said, well, the complaints are the same. They aren't the same. There is the numbness and tingling down the arm and completely affecting the hand. But, I mean, the complaints aren't enough to make the material increase. It's got to be a physiological increase, and that's where you have the joint space narrowing, the progression to the type 3. I suppose what I'm hung up on is the question of increased disability. She was under restrictions at the time of the original hearing, and there's evidence in here from the Cook County records at any rate that those restrictions may very well have been partially because of her shoulder, not only her back. How different is the restriction that she's under at the time of the 19H? No repetitive use of the right shoulder. She didn't have that previously. That takes her out of a lot of different work now than what's don't use vibratory tools or the other one was it wasn't no use of the entire shoulder. So, the commission decision, vibratory tools or operating heavy machinery, she didn't do that under light duty anyway. But apparently the no use of the repetitive shoulder was enough that the county said on March 1st, a couple of months after when their doctor finally got to review that restriction, that's too much, we can't accommodate you any further. Counsel, your time is over. You've gone over there. You had time to reply. Thank you. Okay. Counsel may respond. May it please the court, counsel. Good morning, justices. My name is Sian Flowers, and I represent the defendant in this case, Cook County Facilities Management. It is well understood that the commission's decision is not against the manifest weight of the evidence. Reasonable inferences may be drawn from a particular set of facts. Can I ask you a question? Yes. And it's what Justice Stewart raised. Assuming that the commission was correct that she failed to prove an increase of her disability, why wasn't she entitled to payment of her medical bills? Well, she wasn't entitled to payment of her medical bills because at that time they found that she didn't have a case under 8A. What was disturbing about it was that 8A was brought even though the plaintiff had not had treatment for four-and-a-half years. The commission noted that her pain complaints were exactly the same, and they found no basis for it. But what's more important is that the plaintiff actually testified that she had medical treatment during the four-and-a-half years. In their decision, they said she testified. But that's not my question for you. My question for you is the only evidence in the record as to the causal connection of her condition of ill-being at the time of the 19H was from Dr. Wolin. And he says it is causally connected. So if it is causally connected and her case was tried, you would have paid her medical bills, anything they had to do with that shoulder, for the rest of her life. That is correct. Why didn't you pay them? Right. We didn't pay them after the fact because she had treatment after December 20, 2011. In fact, most of her bills came, my understanding was, in 2012. The bills were presented. The commission decided that Dr. Wolin wasn't credible. They found that there was no causal connection between her current condition that she was complaining of and the original accident date. They found that the four-and-a-half-year gap in treatment made it not causally related, despite the fact that Dr. Wolin said so. The reason being was because Dr. Wolin had not treated her for years. Though we have no separate opinion, we didn't need one. It was interesting that counsel said that her complaints were different. I would note that on January 27, 2011, Plano testified that she had problems sleeping because of her right shoulder and it was painful to move the shoulder all the way up. That was the same complaint she had on October 24, 2012, about a year-and-a-half later. I know she went to the doctor on December 20, 2011, but she could have gone to the doctor at any point in time between May 17, 2007, and December 20, 2011. It is also important to note that she waited almost five years to even bring the original case to trial. So, therefore, counsel claims that her condition destabilized. There's nothing in the record, even her own testimony, that says that her condition had stabilized, meaning that she was pain-free. In fact, she... Does destabilized mean pain-free? That's what I take it as. I mean, I think sometimes people have to live in pain their whole lives, and that's the stabilization of their condition. That's what they're going to have to do. I mean, that's stabilized. It's just as if it's not changing. Right. But that doesn't mean you're pain-free. Right. But what has happened is we don't know when it developed to a type 3, a chromium. We have no idea. It's pure speculation. Because, number one, had she gone to the doctor within those four-and-a-half years, it's quite frankly that she had progressed to a type 3. But we don't know when that happened, because she chose to go to the doctor on December 20, 2011, and then found that it had progressed to a type 3 of chromium does not mean that it occurred after her trial date. There's no evidence in that. In fact, it could have progressed to a type 3 of chromium at the original trial. On that date, January 27, 2011, she was complaining of throbbing pain in her right shoulder, as well as her failure to have to her inability to sleep. We don't know when it occurred, and to speculate that it occurred after October, I mean, after January 27, 2011, is pure speculation. I understand that she, her counsel claims that she had health insurance, but she couldn't go to the doctor. There was nothing to stop her from going into an emergency room if she needed to go. And I want to talk about her light-duty restrictions. She had light-duty restrictions for her low back. There was testimony from Mr. D'Amico, as well as testimony from Jason Henshaw, for which the commission found credible. The plaintiff testified to the opposite regarding these conversations. There's nothing in writing from Jim D'Amico or Mr. Henshaw telling the plaintiff that they would not accommodate any restrictions for her, for her right shoulder. The commission weighed everybody's testimony at the time of the hearing and found Mr. D'Amico and Mr. Henshaw credible. Furthermore, Mr. Henshaw testified that he did not receive any medical bills. He does not receive any medical bills, so therefore he couldn't pay any medical bills. That's not where, he is not the one who pays the medical bills, and the commission found that credible as well. To speak to the question about why the bills weren't paid, Mr. Henshaw testified he didn't receive any bills. And those are penalties, but not to whether the medical bills should have been awarded. Correct. And basically, we paid, there's evidence in the record that the commission found that we did pay the outstanding medical bills from the previous trial decision. It's not as if once that decision became final, October 27, 2011, the medical bills were paid, and permanency was paid. Counsel acknowledged in his brief that he received a payment of about $75,000. So bills were paid, and that went towards, that would go towards penalty. There's a dispute whether the employer properly disputed whether or not this was even causally related, her current condition, to the workplace accident. I wasn't getting a lot of discussion about the penalties. They're going nowhere on the penalties. The question becomes her AA payments to me. That's the important thing for me. Why isn't she entitled to payment of medical? You say there's no evidence of when it progressed from a type 2 to a type 3. Correct. Was there any evidence in the original hearing as to what it was then? No, there was no, because she hadn't gone to the doctor. But we know that after the original hearing, we've got a type 3, and we know that it started out as a type 3. She had surgery that went to a type 2, and then sometime after the original hearing, it's a type 3. So your argument is that it's total speculation that it happened after the original hearing, I take it. But you also said that they found that Wolin was not credible. They never said that. Well, they never said it, but obviously Wolin's opinion that it was causally related is a factor. I would argue that it's a factor that they consider in addition to the plaintiff's testimony. The medical bills were paid. When we lost the original decision and it was confirmed, we paid the medical bills. Now the plaintiff comes with this new complaint. I had an increase in my condition. I'm getting worse. We properly disputed that. We properly disputed the fact. So the trial came very quickly is what I want to say. The petition was filed. December 20, 2011 is when she had the x-ray, found the type 3 acromion. Around March 1 of 2012, she was told that her workplace conditions, restrictions that she had for the low back were not being accommodated. Fast forward to September, now you have a filed petition for a 19HAA. And then the trial was October 24, 2012. Had we been ordered to pay the medical bills regarding that post-treatment, we would have paid them. I think because the trial dates were so close and it's in such close proximity that my employer paid the bills that they were ordered to pay for the previous treatment before the trial date, the original trial date. Now we have this new case, this new incident, this new claim. Now we have a dispute. We don't think it's work-related. Mr. Henschel testified he did not receive any medical bills. So we had our proper right to dispute the fact that she even had... You're right, and that goes to penalties. And that's why I tell you, stay off the penalties. They're not going to win on the penalties. The question becomes, okay, but the fact of the matter is they're treating her shoulder. And she's got a shoulder injury, and she had a shoulder injury. She always did. So why aren't they paying the bills? Well, I can't... Mr. Henschel testified that he did not... Let me put it this way. Not why aren't they paying the bills. Why didn't the commission order the bills to be paid? The commission didn't order the bills to be paid because they didn't find that her current condition was causally related. Why didn't they do it under 880? I can't... Okay, so my next question is to you. If the current condition of her left shoulder is not causally related to original injury, from whence did it come? Where did this condition come from? Well, the condition came from, well, I mean, I can only speculate... There's no new injury. No one ever testified to a new injury. Well, that's true. We don't have anybody to testify that there was a brand-new injury. What we can speculate on, and I'm not going to... is that once the plaintiff's light duty restrictions were taken away from her, and she was told to work full duty and come back as an iron worker, that's when we have this opinion. The opinion came in April of 2012. This is about a month and a half afterwards. I am also curious to know about this November 27, 2012 opinion, because that's even after the 19-H trial. That came after the fact. So I'm not sure when it was entered into evidence. I did not handle the underlying trials, so I can only speculate as to why there was this complaint. And I do want to note that my brief may have appeared that Ms. Holliday, the plaintiff, does not work for the county anymore. As we stand here today, she's currently an employee of the county. She was never terminated. I did speak with counsel about that beforehand. As I'm reading the record, brand-new and fresh eyes, it seemed to be that impression that Mr. D'Amico is no longer with the county anymore for me to confirm with him. But I will say that once the light duty restrictions were not accommodated any longer for the low back and Ms. Holliday was told to come back to work full duty, that's when we have this causation opinion. I think it's litigation bought, and I don't think that we violated any of her 8A rights. Mr. Henschel testified that he did not receive any information. Mr. D'Amico testified that he wasn't aware of any restrictions. Can you ask me a question about that? You're opposing counsel. I thought I heard him say that this medical treatment, this recent medical treatment that they're seeking payment for, was authorized. Well, that's what I'm confused about. You're saying we gave you any bills or anything, but did they in advance authorize it? Well, my understanding of it, based on the record, it appears that it was authorized. Who authorized it? I would assume the way the county works, they go directly, sometimes the doctor calls. We have a separate third party. So it wasn't Mr. D'Amico and the two people? Not at all. It could be somebody else. Somebody with authority authorized it. Do you agree with that? Somebody had to. I agree. I can concede that point. Unfortunately, we don't have the direct, direct communication. And there's a few third parties that handle bills, and there are third parties that process and talk to the doctors. We even have nurse case managers. So at some point someone authorized it. But whether or not that particular x-ray was authorized and whether or not those bills came from that particular one authorization on December 20, 2011, is something I can't really speak to. I would like to say that the commission's decision was not against the manifest weight of the evidence, that it shouldn't be disturbed by this court. And thank you. If there are any other questions. I don't believe there are. Thank you, counsel. Counsel, you may reply. Thank you. Concerning the bills that were authorized, the treatment was authorized by Mr. Henschel, and that's acknowledged in Dr. Walden's record. So there is a clear record of that. So why didn't he pay the bills? It's in his testimony. It's very clear from his testimony there was a turf dispute going on between Mr. Henschel, who was the adjuster on the work comp case, and Mr. D'Amico, who was with facilities management. And I'm directing to Mr. Henschel's testimony where he said the reason he didn't pay TTD on the bills was because facilities management stopped accommodating her restrictions, and it was their responsibility to do so. That's 657 in the record. And then later he says on cross, he didn't process the payments because he felt facilities management should be paying her salary, and it wasn't his responsibility to pay TTD benefits or the medical bills. Then he said that he wasn't paying benefits based on the ADA, which he thought said that if she had a non-work-related injury and they accommodate them, she's paid salary. So I said, well, what medical did you review that made you think that it was unrelated? And he said, well, I thought that we settled her case, not that she had an award. That's on page 66661. But he had previously reviewed their payment, their payout letter, which was their only exhibit, where he acknowledged that he paid an award. So he knew he didn't pay. It was a settlement or the rights weren't closed out. He was not a credible witness. Then he acknowledged that the petitioner's treating records needed to be reviewed to determine whether TTD and medical should be paid. So I asked him, did you review the records? We sent them to your attorneys. There are exhibits on part of the record. He said he never received any records because the state's attorney's office – or wait. He said he never received any records from the state's attorney's office to review. Well, the record is clear they got the records. And the record is clear they got the bills because those are my exhibits, including the faxes. Can I ask you a question, please? If an individual is an original hearing before the commission and it is determined that they have restrictions and they have ongoing issues with a body part and the employer accommodates those restrictions for a period of time and then the employer stops accommodating the restrictions, are they entitled to TTD again, even absent an increase in disability? Yes, because under the Poor v. Industrial Commission because the condition is destabilized. If there's a destabilization that we clearly think there was in this particular case with the new symptoms that she had, the tingling down the arm affecting the whole hand, the narrowing of the acromion, I would say yes, she is. The council made a statement that they properly disputed the medical. We sent a letter, and I've been before you before with this. We sent a letter as we do on all of our cases. Enclose all the medical records, pay TTD, enclose all the bills, pay the bills. If you're disputing these, please provide us with a detailed written explanation for your dispute pursuant to Rule 7110.70. They did not provide any type of explanation. There is none in the record and there was none made. I hold the opinion that that should always result in a ward of penalties when there's no explanation given for nonpayment of benefits, and especially in this case where the treatment was authorized. Those are not relying on any other expert's opinion because they didn't get one. That's correct. And as far as the TTD goes, it wasn't just a matter where they said enough is enough. We no longer want to accommodate you anymore. We're done with you. There's more to it than that and it's related to her physical condition. They had her doing data entry for all of that time, and her only shoulder restrictions were no use of heavy machinery and no vibratory tools. She could comply with, she could do the data entry, but now she's got a restriction of no repetitive use of the right shoulder. She needs to repetitively use the right shoulder doing data entry, and that's where the breakdown occurred. So it's more than just saying enough is enough and we're not going to accommodate anymore. It was this new restriction from Dr. Walden, which I argue shows is one of the factors showing the material increase in her condition. Now, your entitlement to TTD, I take it, is from March of 2012 to October 24th of 2012? Yes, Your Honor. So now the question I have, is there evidence in the hearing, the 19-H hearing, that although they said they wouldn't accommodate her condition, that she was actually out of work? That she did not work after they said they couldn't accommodate? That she was not working after March 1st? Yeah. Is there evidence that she was not working after March 1st? Well, there's no evidence she was working anywhere else. There was evidence that she was no longer working there, but that was her last day that she worked there on the 1st. Because, you know, it's not a question of whether she did or did not work. It's a question of, well, could she work? Right. And if she did work, she may not be entitled to TTD. That's why I'm asking questions. There's no evidence that she worked anywhere else in the county after her last day with the county on March 1st. Okay. Thank you, counsel. Thank you, counsel, both, for your arguments in this matter. It shall be taken under advisement that this position shall issue. The court will stand in recess subject to the court.